Amy BANKS, Plaintiff,

v.

The ARMED FORCES BANK,
et al., Defendant.

No. 02–4259–RDR.

United States District Court,
D. Kansas.

March 3, 2004.

Alan V. Johnson, Stephen D. Lanterman, Sloan, Listrom, Eisenbarth, Sloan & Glassman, LLC, Topeka, KS, for Plaintiff.

Michael J. Gallagher, Gallagher & Kaiser, Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

According to the final pretrial order, this action alleges the violation of plaintiff's employment rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Employment Retirement Income Security Act (ERISA, 29 U.S.C. § 1001 et seq.); and the Family and Medical Leave Act (FMLA, 29 U.S.C. § 2611 et eq.) Plaintiff worked for defendant Armed Forces Bank from March 2001 to July 3, 2002. Defendant Armed Forces Bank is a subsidiary of defendant Dickinson Financial Corporation. This case is

now before the court upon defendants' motion for summary judgment.[1]

Uncontroverted facts

Plaintiff began working as an accounting clerk for defendant Armed Forces Bank (AFB) on March 26, 2001 in Leavenworth, Kansas. AFB is a national banking association operating in 17 states. Defendant Dickinson Financial Corporation owns all of the capital stock of AFB and is the parent company of AFB. Plaintiff was an employee of AFB, not an employee of Dickinson. However, Dickinson provided short-term and long-term disability benefit plans for AFB and is the plans' administrator.

Plaintiff did not work at a commercial facility of AFB. The facility where she worked did accounting and administrative functions. It had no tellers and no capacity to receive deposits or allow withdrawals. Employees who were also customers of AFB conducted their business at the commercial locations of AFB or mailed deposits to the commercial locations through the company's internal mail system.

Plaintiff was supervised by Barbara Cassella until January 2002. Then Karin Mance became plaintiff's supervisor. The president of AFB was Don Giles.

Plaintiff became pregnant around July 2001. She took medical leave on December 6, 2001 due to complications with her pregnancy. She returned to work from her medical leave on April 15, 2002. On June 3, 2002 plaintiff changed from a 40–hour per week schedule to a 30–hour per week schedule. Plaintiff's last day of work was July 3, 2002. She signed a voluntary resignation form which stated that she left because she was offered another position with another company. She e-mailed her supervisor about her resignation, stating that she was resigning because she was offered a better position and more flexible schedule with another company and that it had nothing to do with AFB.

Plaintiff alleges that on or about December 4, 2001, plaintiff was summoned to Barbara Cassella's office where a heated exchange occurred. Plaintiff alleges that Cassella slammed the door, accused plaintiff of getting pregnant on purpose, told her she had no more time off remaining for the rest of the year, and asked if she fully intended to return to work after her pregnancy. Plaintiff said she did intend to return to work.

Plaintiff had a doctor's appointment on December 5, 2001. Her doctor advised her to cease working. Plaintiff asserts that this was because of the stress plaintiff was experiencing at work. Plaintiff worked two hours the next day (December 6) and then went on medical leave.

Plaintiff asserts that on December 6, 2001 she delivered an application form for short-term disability benefits to Corliss Fox, a human resources employee at AFB. However, the application which was acted upon is dated December 15, 2001. Plaintiff claims this was the second application and that the first application was lost by Fox. Plaintiff asserts that Fox told her that she would start receiving short-term disability benefits after a two-week waiting period and, thereafter, would receive weekly payments. The first check was issued on January 8, 2002 and included back pay to December 20, 2001, the first day plaintiff became eligible for short-term disability benefits.

Plaintiff eventually received all of the short-term and long-term disability benefits to which she was entitled.

---

**1.** Plaintiff's motion for leave to file a surreply brief in connection with the summary judgment motion shall be granted.

While on medical leave, plaintiff stopped by the office twice but was told she should not be there. Other employees who were on medical leave were not told that they could not visit the office. Nor was there a policy prohibiting employees on medical leave from coming to the office. Defendants assert that they were concerned because plaintiff was supposed to be on bed rest. Plaintiff has denied telling AFB this, although there is at least one e-mail from plaintiff in which she refers to being on "bed rest." Plaintiff has stated in her deposition that she was even told she could not do consumer business at a commercial office of AFB.

In March 2002, AFB charged plaintiff's checking account $120.00 because she wrote six checks between March 13 and March 15, 2002 when there were insufficient funds to cover the checks. Plaintiff claims that she overdrew her account because she did not receive overdraft notices and because of the delay in receiving short-term disability benefits in December, which put her behind and forced her to borrow money. She asserts that the overdraft notices were sent through interoffice mail to her desk and that AFB did not forward the notices to her at home while she was on medical leave. Plaintiff claims this was a discriminatory action.

Plaintiff asked AFB to refund the overdraft charges. AFB initially refused. This angered plaintiff. Eventually, on May 22, 2002 after plaintiff raised the issue again, AFB waived half of the charges.

After her short-term disability benefits expired, plaintiff received two long-term disability payments. One payment was received on April 15, 2002. The other was received on April 30, 2002. Plaintiff admits that she received all of the payments to which she was entitled, but she alleges that there was a delay in her receipt of long-term benefits because AFB failed to apply for the benefits in a timely and proper manner.

About April 1, 2002, plaintiff discussed her return to work with Corliss Fox. She claims that she was informed by Fox that she could take FMLA leave intermittently during the summer to care for her newborn child. Based on these representations, plaintiff made arrangements not to have child care on Tuesdays and Thursdays during the summer, as she intended to use FMLA leave on those days. On April 18, 2002, three days after plaintiff had resumed working, she discussed the subject of FMLA leave with Karin Mance. Mance told plaintiff that she could not use FMLA leave the way she had planned. When plaintiff responded that this would cause a baby-sitting problem, Mance replied that if plaintiff wanted to work 30 hours per week during the summer, she could do so. On April 29, 2002 plaintiff received an e-mail from Mance which said that the shift to 30 hours a week, if accepted by plaintiff, would be a permanent change. Otherwise, plaintiff would remain in a 40–hour per week job. Plaintiff accepted the 30–hour per week work schedule. She stated she did this under duress because of the child care arrangements she had already made on the basis of the previous assurance that she could use FMLA leave intermittently.

On June 14, 2002 plaintiff sent an e-mail to Don Giles, the president of AFB, which complained that she had not received an annual performance review.[2] The review was not completed in the usual time frame for such reviews. Of course, plaintiff had not worked for Karin Mance as her supervisor until April 15, 2002 when she returned from medical leave. This was more than a year after her March 26 anniversary date of employment. Sometime during

---

2. This was a lengthy e-mail which also complained of discrimination and harassment.

the week before she resigned, which was the last week of June 2002, plaintiff received a copy of the final version of her performance review. A meeting to discuss the performance review did not occur prior to plaintiff's resignation. The result of the performance review was "meets expectations." This result would have entitled plaintiff to a pay raise retroactive to March or April 2002, if plaintiff had been able to discuss the review with her supervisors and had signed the review before resigning.

Previous to the June 14, 2002 e-mail, on January 8, 2002 and April 10, 2002, plaintiff also e-mailed Don Giles complaining about discrimination or harassment in various respects.

On July 3, 2002 plaintiff completed an exit interview questionnaire in connection with her resignation. In response to the question of why she was leaving, plaintiff wrote: "Another opportunity w/better pay, benefits, 401K. Felt forced to do so with everything being cut because of HR errors." Plaintiff testified in her deposition that she was paid $2.50 an hour more at the new job, but that she lost a "lot of drive time and time with my kids." Deposition at p. 139.

Legal standards

The well-known standards in this area were summarized in the case of *Kennedy v. General Motors Corp.*, 226 F.Supp.2d 1257, 1261–62 (D.Kan.2002):

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essen-tial to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing Adler, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505, 91 L.Ed.2d 202; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, 91 L.Ed.2d 265. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505, 91 L.Ed.2d 202; accord *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that

would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams*, 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (quoting Fed. R.Civ.P. 1).

Plaintiff's claims

According to the pretrial order, plaintiff is advancing four theories of recovery: 1) a claim of disparate treatment under Title VII on the basis that she was treated differently because she was a woman who was pregnant; 2) a claim for retaliation under Title VII because she was retaliated against and ultimately forced to leave her position (constructively discharged) because she was a woman who was pregnant; 3) a claim for violation under ERISA on the basis of defendants' failure to provide her benefits in a proper and timely manner; and 4) a claim for violation of the FMLA because she was denied leave under the FMLA and ultimately forced to leave her position (constructively discharged) because of her attempts to obtain leave under the FMLA.

As noted later, the description of these claims is somewhat different in plaintiff's response to defendants' motion for summary judgment. But, these four claims shall serve as the outline for the remainder of this order.

Disparate treatment in violation of Title VII

Plaintiff alleges that she was discriminated against in her employment by AFB and that this discrimination was based on her pregnancy. Plaintiff alleges that this discrimination was manifested in two adverse actions: 1) banning plaintiff from her office and from commercial AFB banking facilities while she was on medical leave; and 2) failing to forward interoffice notices or bank statements to plaintiff which caused her to incur overdraft charges.

■ It is essential to plaintiff's case that she show, among other things, that an "adverse employment action" was taken against her. Recently, the Tenth Circuit has approved a definition of "adverse employment action" as " '[a] tangible employment action [which] constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' " *Tran v. Trustees of the State Colleges in Colorado,* 355 F.3d 1263, 1267 (10th Cir.2004) (quoting, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)); see also, *Meiners v. University of Kansas,* 359 F.3d 1222 (10th Cir.2004) (applying same standard). Under this definition, the court does not believe that plaintiff's alleged exclusion from her office and AFB banking facilities while she was on medical leave and the failure to forward interoffice notices of overdrafts qualify as adverse employment actions.

We acknowledge that the Tenth Circuit has followed a perhaps more liberal "case-by-case approach" in prior cases. A case relied upon by plaintiff, *Corneveaux v. CUNA Mutual Ins. Group,* 76 F.3d 1498, 1507–08 (10th Cir.1996), appears to be an example of that approach. There, plaintiff

asserted that she was forced to sign a release of claims in order to receive a severance benefit of $7,000 in retaliation for filing a discrimination charge. When she refused, she did not receive the money.

A loss of $7,000 or actions threatening such a loss could be considered a "significant change in benefits." Here, there is no allegation of a decision which caused or could cause a significant change in benefits, responsibilities or employment status.

The Tenth Circuit has also stated that the case-by-case approach does not permit an "adverse employment action" to include acts which cause " 'a mere inconvenience.' " *Heno v. Sprint/United Management Co.,* 208 F.3d 847, 857 (10th Cir.2000) (quoting, *Sanchez v. Denver Public Schools,* 164 F.3d 527, 533 (10th Cir.1998)). We believe the restrictions placed upon plaintiff while on medical leave and the failure to notify her of overdrafts fall in the category of "inconvenience" as opposed to "adverse employment actions." See *Amro v. Boeing Co.,* 232 F.3d 790, 797–98 (10th Cir.2000) (delay of several months in accomplishing desired transfer is not an adverse employment action); *Martinez v. Henderson,* 252 F.Supp.2d 1226, 1236 (D.N.M.2002) (various "inconveniences" including exclusion from workplace on days off do not qualify as adverse employment actions); *Kennedy,* 226 F.Supp.2d at 1269 (denial of preferred vacation time and bereavement time does not qualify as an adverse employment action).

Retaliation and Constructive Discharge in violation of Title VII

*Constructive Discharge*

Plaintiff asserts that AFB retaliated against her because she complained of Title VII discrimination. She further asserts that the retaliation was so severe that it resulted in her constructive discharge from employment. According to plaintiff's brief there were six adverse actions which produced the constructive discharge: 1) the failure to forward overdraft notices or bank statements which had been sent by interoffice mail while plaintiff was on medical leave; 2) the failure to honor representations by Corliss Fox that plaintiff could use her FMLA leave intermittently to care for her children in the summer, thus requiring plaintiff to accept a 30–hour work week on a permanent basis; 3) initially telling plaintiff the 30–hour work week would be limited to the summer, but later saying that the reduced hours would be permanent; 4) agreeing to waive only half of plaintiff's $120 overdraft charges; 5) failing to complete plaintiff's performance review in a timely manner and failing to meet with plaintiff regarding the review, thus causing plaintiff not to receive a retroactive pay increase; and 6) the combination of the five above-alleged adverse actions. "A constructive discharge occurs when a reasonable person in the employee's position would view her working conditions as intolerable and would feel that she had no other choice but to quit." *Tran,* 355 F.3d at 1270. "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Jeffries v. State of Kansas,* 147 F.3d 1220, 1233 (10th Cir.1998). "The bar is quite high in such cases: a plaintiff must show [s]he had no other choice but to quit." *Garrett v. Hewlett Packard Co.,* 305 F.3d 1210, 1221 (10th Cir.2002).

■ The court does not believe a reasonable jury could find on the record, viewed in a light most favorable to plaintiff, that a reasonable person in plaintiff's position at AFB would view her working conditions as intolerable. The overdraft charges were $120, roughly one day's pay for plaintiff. She continued to work for many weeks while objecting to the overdraft charges and eventually the charges

were cut in half. We do not believe the overdraft charges made her working conditions intolerable. The refusal of AFB to allow plaintiff to work a 30–hour week in the summer of 2002 and then return to a 40–hour week appears to be primary grounds for plaintiff's constructive discharge claim. Plaintiff asserts that she was led to believe by Ms. Fox in April 2002 that she would be able to work a 30–hour week during the summer by using FMLA leave on an intermittent basis. Then, according to plaintiff, she learned sometime later in April that this would not be allowed and that her choice was either working a 30–hour week permanently or continuing to work at her 40–hour per week job. On May 3, 2002 plaintiff e-mailed Karin Mance that she would take the 30–hour week option beginning in June 2002. When plaintiff left the job in early July 2002, she accepted a 40–hour, 5–day a week position which paid more. Plaintiff's deposition at pp. 139–40. Plaintiff contends that she was forced to take the 30–hour option because, after initially arranging her child care around 30–hour work weeks over the summer, she was unable to arrange for child care to cover the extra ten hours if she maintained her 40–hour per week job.

While the court does not want to be insensitive to the difficulties in arranging adequate day care for children, we do not believe an employer can be reasonably accused of making working conditions intolerable by informing an employee in late April that, starting in June, the employee can either take a permanent 30–hour per week job or keep her current 40–hour per week job, even if plaintiff had originally been led to believe by the employer that she could use FMLA leave intermittently and only work a 30–hour week during the summer, and later resume her regular hours.

The delay in conducting plaintiff's performance review caused a delay in plaintiff receiving a retroactive pay increase. After plaintiff mentioned in the June 14, 2002 e-mail that she had not yet had a performance review, steps were taken to complete one. According to plaintiff, the review should have been completed by May 15, 2002. Plaintiff received a copy of the performance review, which concluded that plaintiff met expectations, during the last week of June 2002. Plaintiff did not meet with her supervisors to discuss and sign the review prior to her resignation during the first week of July 2002. Therefore, plaintiff did not receive a retroactive pay raise, which she merited on the basis of the evaluation.

Again, the court does not believe a reasonable jury would find these circumstances to be intolerable. Plaintiff's employer belatedly completed a performance review which would have afforded plaintiff a 3% raise in pay.[3] Plaintiff was aware of the conclusions of the review prior to her resignation, and the completion of the review process was apparently imminent. The delay in receiving a pay raise based upon the review was not an intolerable working condition. Plaintiff had worked in her position at the original rate of pay for a considerable period of time.

Examining all the alleged adverse working conditions together, the court does not believe a reasonable issue of constructive discharge is presented. At or near the time of her resignation, plaintiff had the option of working the same number of hours at the same rate of pay she had when she started the job slightly more than a year before. She chose to accept a permanent 30–hour per week position be-

---

**3.** This estimate is made in defendant's reply brief and not disputed in plaintiff's surreply brief.

cause she could not access acceptable day care for an extra 10 hours a week during the summer. She could have continued in a 40–hour per week position if she had so chosen.[4] The court does not find that a reasonable person could consider these circumstances to be intolerable, even adding the dispute concerning the $120 in overdraft charges to the scenario. Therefore, the court will grant summary judgment against plaintiff's constructive discharge claim.

*Retaliation*

Initially, we address the issue of whether a claim of retaliation for protected opposition activity has been properly asserted by plaintiff at this stage of the proceedings. Although defendants do not claim surprise, they do contend that plaintiff did not state a claim for retaliation on the basis of protected opposition in the charge of discrimination or the complaint. Plaintiff has responded that such a claim is made in the pretrial order, as well as in plaintiff's EEOC questionnaire and the amended complaint.

■ Upon review, the court agrees that the EEOC questionnaire states that plaintiff is asserting that she was retaliated against for opposing discrimination. However, we do not read the amended complaint as making such a claim. The claim is also not directly stated in the pretrial order; it is not expressed in plaintiff's factual contentions, nor is it stated in plaintiff's theories of recovery. Instead, plaintiff asserts there that she was retaliated against because she was a woman who was pregnant. Retaliation in response to protected opposition to discrimi-

nation is listed on page 9 of the pretrial order as an "issue of fact" related to plaintiff's second theory of recovery. But, the same section of the pretrial order lists as a legal issue: "Whether plaintiff may assert a claim of retaliation based on her alleged oppositional activity because this claim was not asserted in a Charge of Discrimination or in the Amended Complaint?" Under these circumstances, we find that the document controlling the claims of the parties at this stage in this case does not adequately state a claim of retaliation on the basis of protected opposition and, therefore, the claim should not proceed unless plaintiff is given leave to amend the pretrial order to make such a claim.

However, even if a claim for retaliation against protected opposition was made in this matter, summary judgment against the claim would be proper because "adverse employment actions" were not committed by defendants. The adverse employment actions claimed by plaintiff either were too insignificant to be adverse employment actions under the law, or they were actions chosen by plaintiff, not dictated by defendant. The failure to forward overdraft notices or bank statements, or the assessment of overdraft charges, should not be considered to be adverse employment actions for the reasons discussed previously in this order. The delay in completing the annual job performance review also should not be considered an adverse employment action. The delay would not have resulted in a loss of compensation to plaintiff if she had not voluntarily left her employment at AFB prior to finishing the review process.[5] Finally, the

---

4. At page 168 of her deposition, plaintiff was asked: "And if you found a baby-sitter, you had your 40–hour a week job, didn't you?" Plaintiff answered: "Yeah."

5. This aspect of the retaliation claim has also been belatedly raised. In her deposition,

plaintiff states that she is not claiming that she was denied a pay increase because of any wrongful motive. Deposition at p. 27. In addition, plaintiff does not list the delay in the performance review and any consequential delay in receiving a pay increase as a factual contention in the pretrial order.

change to a 30–hour position was plaintiff's choice, not a retaliatory adverse employment action by AFB.

Summary judgment is also warranted against the retaliation claim because the record demonstrates that plaintiff cannot prove a causal connection between any protected activity and the alleged adverse employment actions. We assume here that plaintiff has established a prima facie case of discriminatory retaliation on the basis of the temporal proximity between plaintiff's complaints of discrimination and the alleged adverse employment actions. This places the burden upon defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir.1999) cert. denied, 529 U.S. 1110, 120 S.Ct. 1964, 146 L.Ed.2d 796 (2000).

The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the [action]; the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion. However, the proffered reason for the action taken against the minority employee must be reasonably specific and clear.

*EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir.1992). If defendant is able to articulate a valid reason, the plaintiff can avoid summary judgment "only if [it] is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." *Perry*, 199 F.3d at 1135.

In this instance, the evidence is undisputed that AFB's FMLA policy did not permit the use of FMLA leave on an intermittent basis for day care purposes. See defendants' uncontroverted fact # 122 and

plaintiff's response in uncontroverted fact # 186. Therefore, AFB has articulated a valid reason for correcting any previously stated understanding as to whether plaintiff could use FMLA leave intermittently in order to work 30–hour weeks during the summer. The record also contains evidence that plaintiff's supervisor delayed the completion of plaintiff's annual performance review because plaintiff had been off work since December 6, 2001, and when she returned (on April 15, 2002) her job responsibilities were somewhat different. Deposition of Karin Mance, p. 139. Defendants also assert that Mance had not supervised plaintiff prior to April 15, 2002.

Because facially legitimate reasons for the alleged adverse employment actions have been presented, plaintiff must demonstrate that she could present conflicting facts to create a genuine issue as to whether the reasons are legitimate or simply a pretext for retaliation. To establish pretext, plaintiff must show either that "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence ..." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This may be done by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (citations and quotations omitted). Mere allegations are insufficient. *Id.* at 1324.

"[T]emporal proximity between an employee's protected conduct and an adverse employment action 'is not sufficient by itself to raise an issue of fact' regarding pretext." *Tran*, 355 F.3d at 1270 (quoting,

*Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir.2000)).

Aside from temporal proximity, plaintiff argues that there has been a pattern of retaliatory conduct which supports a finding of causality and pretext. Plaintiff cites *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324 (10th Cir.) cert. denied, 518 U.S. 1019, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996) for this proposition. There, a defendant employer fired the plaintiff's wife, cited plaintiff for deficiencies on the job, demoted and transferred plaintiff, and ultimately fired plaintiff, all within an eight-month period, allegedly in retaliation against plaintiff's complaints and legal actions regarding the failure to pay overtime in accordance with federal law. In the instant case, the alleged series of retaliatory actions are not nearly so substantial.

■ In the instant case, there was a delay in receiving long-term disability benefits, but plaintiff eventually received all of the benefits to which she was entitled. There was a failure to forward interoffice overdraft notices and bank statements while plaintiff was on leave from the office. But, this did not impact plaintiff's pay, responsibilities or benefits at work. There was the refusal to grant plaintiff intermittent FMLA leave during the summer, despite a prior indication that such leave could be arranged. But, plaintiff does not deny that she could have maintained her same job, pay and benefits had she been able to arrange the necessary child care. Finally, there was a delay in completing plaintiff's annual performance review. However, again plaintiff would have obtained the retroactive pay increase which accompanied the performance review if she had not resigned before it was arranged for her to sign off on the review. Also, plaintiff did not make this part of her factual contentions in the pretrial order or claim the lack of a pay increase as a retaliatory act in her deposition. Unlike Marx, in this case the "pattern" of retaliatory acts had virtually no impact upon plaintiff's employment status. Furthermore, most of the actions within the "pattern" involved matters which were not handled to plaintiff's satisfaction after she made requests of her employer, as opposed to punishments initiated by an employer. See *Meiners*, 359 F.3d at 1231 ("[t]emporal proximity is much less suspicious when the adverse action is the denial of an affirmative request the plaintiff made subsequent to the protected activity"). Even assuming that a reasonable employee in plaintiff's position would also feel dissatisfied, we do not believe there is enough in the record for a rational jury to infer that AFB acted with a retaliatory animus.

Plaintiff also asserts that pretext or motive can be inferred from evidence that AFB acted contrary to unwritten policy or company practice in taking an adverse employment action. Plaintiff cites *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000) in support of this point. Once again, the "policy" cited refers to the time for completing the performance review. Plaintiff contends that AFB had a policy of completing a performance review within 30 days of an employee's return to work. Plaintiff cites the deposition of Don Giles, the president of AFB, who stated: "I would say that we try to—if someone comes back, we try to get it done within a 30–day period ..." Deposition at p. 50.

The relevance of actions which are contrary to written or unwritten policy is that it can show that an employee was treated differently than other employees under similar circumstances. *Kendrick*, 220 F.3d at 1230. Plaintiff's evidence falls short in that regard. Mr. Giles' testimony does not demonstrate a hard and fast policy of doing performance reviews within 30 days. Nor does it contrast plaintiff's treatment

with the treatment of other employees who were on leave at the time a performance review was due. On this topic, Karin Mance testified that she had not had another employee on leave when a performance review was due.[6] In sum, we do not find the alleged violation of policy to be persuasive proof of pretext.

Finally, plaintiff claims that pretext can be established by proof that Karin Mance prepared a memorandum in response to allegations plaintiff made in an e-mail to Mr. Giles on June 14, 2002. Plaintiff cites *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir.2000) for this argument. In Pastran, circumstantial evidence of a retaliatory motive was gleaned from a district manager's instruction to a store manager to prepare statements in anticipation of discrimination litigation from the plaintiff involving, among other things, a lost promotion which plaintiff complained was discriminatory. In the instant case, there is no evidence or claim that Ms. Mance was preparing her response to plaintiff's e-mail in anticipation of being sued, nor is it a reasonable inference.

In summary, for the above-stated reasons, and looking at the record in a light favorable to plaintiff, the court finds that plaintiff could not establish to a reasonable jury's satisfaction that the reasons defendant has offered for the alleged adverse employment actions are a pretext for retaliation. For this reason and others stated above, summary judgment should be granted against plaintiff's retaliation claim.

### ERISA

Defendants' motion for summary judgment argues that plaintiff's ERISA claim should be dismissed because plaintiff received all of the short-term and long-term disability benefits to which she was entitled and because she did not assert a claim to the plan administrator before filing the claim in the instant case. Plaintiff has responded that her claim is that defendant Dickinson Financial Corporation, the plan administrator, breached its fiduciary duty by failing to process plaintiff's applications for short-term and long-term benefits in a timely manner and to give plaintiff accurate information in regard to her benefits. According to plaintiff, this leads to a claim under 29 U.S.C. § 1132(a)(3). Defendants have replied by reiterating that plaintiff received all the compensation due, by asserting that the insurance carrier controlled the timing of the payments, by claiming there were no significant delays in payment, and by asserting that there are no legal grounds for the imposition of civil penalties under 29 U.S.C. § 1132(a)(3) or § 1132(c).

In surreply, plaintiff contends that defendants construe those statutory sections too narrowly. Plaintiff asserts that she made a "general request for information about her disability benefits in her e-mail to Don Giles of January 8, 2002" where she stated as a small part of a lengthy message:

> ... I have not received one dime of disability insurance I was told would start after a two week waiting period. How do I pay for insurance when I am not receiving mine? ? So I call Met life [sic] and it hasn't even began to be processed.

Although plaintiff admits that her short-term disability payments began on January 8, 2002 (statement of fact no. 78), she asserts that the failure of Dickinson Financial Corporation to respond to her January 8 "request for information" warrants the application of a civil penalty under 29 U.S.C. § 1132(c)(1)(B) which provides:

---

**6.** Q. Do you remember who else you postponed their review because they were on leave? A. I have never had anyone else. Deposition at p. 140.

Any administrator ... (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

■ The claim that a request for information was improperly denied is not part of plaintiff's claims listed in the pretrial order. However, defendants do not object on this basis. Defendants assert that there is no factual basis for the recovery of a civil penalty in this case. The court, examining the record in a light most favorable to plaintiff, agrees. The request for information identified in plaintiff's briefs (which seems more like a rhetorical question) is so vague and ambiguous that justice and fairness would not be served by the application of a civil penalty. See *Anderson v. Flexel, Inc.*, 47 F.3d 243, 248 (7th Cir.1995) (a response is necessitated when the request gives the administrator clear notice of what information the beneficiary desires); *Moothart v. Bell*, 21 F.3d 1499, 1503 (10th Cir.1994) (a demand for benefits is not a written request under § 1132(c)(1)); *Pane v. RCA Corp.*, 868 F.2d 631, 638–39 (3rd Cir.1989) (request for coverage is not a request for information).

■ Finally, plaintiff's allegations that benefits were not paid in a timely fashion do not present a viable claim for relief in this case. In plaintiff's response to the summary judgment motion, plaintiff asserts that defendant Dickinson breached its fiduciary duty under ERISA and is liable for that breach under § 1132(a)(3). This section permits a plan participant or beneficiary "to obtain ... appropriate equitable relief (i) to redress" violations of ERISA or the terms of the plan. However, in the pretrial order, plaintiff asks for statutory penalties in connection with her ERISA claim. The pretrial order does not mention equitable relief. Section 1132(a)(3) does not provide for statutory penalties. Moreover, any damages or harm caused by a delay in the receipt of disability payments falls within the category of compensatory, not equitable relief, particularly where there is no allegation of bad faith. See *Moffett v. Halliburton Energy Services, Inc.*, 291 F.3d 1227, 1234 (10th Cir.2002); *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 943–44 (8th Cir. 1999). In addition, there is no recitation or explanation of what ERISA provision or plan term was violated by the plan administrator in this instance. For all of these reasons, the court shall grant summary judgment against plaintiff's claim under ERISA for any delay in the receipt of disability benefits.

## FMLA

Plaintiff asserts that defendant AFB violated the FMLA by failing to provide plaintiff with intermittent leave and by retaliating against plaintiff for exercising her rights under the statute. Plaintiff concedes that AFB was not obligated by the language of the FMLA or AFB written policy to provide plaintiff with intermittent leave for child care purposes. But, plaintiff contends that AFB was obligated by equitable estoppel to honor the alleged statement of Corliss Fox that plaintiff could have intermittent leave during the summer through the FMLA.

Assuming that one may read a remedy like equitable estoppel into the FMLA, the record demonstrates that this remedy should not apply here because plaintiff cannot establish the critical element of detrimental reliance.

Reading the record in a light most favorable to plaintiff, one may assume that Corliss Fox told plaintiff near the beginning of April that plaintiff could have intermittent leave under the FMLA to watch her children during the summer while working 30–hour weeks at AFB. Relying upon this information, plaintiff made daycare arrangements for her children during the summer. On April 18, plaintiff was told that she could not have intermittent leave. She was informed that instead she could either accept a 30–hour position or retain her 40–hour position. Later, she was told the 30–hour position, if she chose it, would be permanent. In early May, plaintiff decided to take the permanent 30–hour position beginning in June. Then, in early July, plaintiff left AFB for a 40–hour a week job with better hourly pay and more flexibility.

Equitable estoppel requires substantial detrimental reliance. See *Swearingen v. Honeywell, Inc.,* 189 F.Supp.2d 1189, 1196 (D.Kan.2002) (finding an allegation of reliance to plaintiff's "substantial detriment" adequately states a claim for estoppel under ERISA). A rational jury could not find that the child care arrangements plaintiff made six to eight weeks in advance in reliance upon the alleged promise of intermittent FMLA leave constituted substantial detriment or reliance to support a claim of estoppel. See *First National Bankshares v. Geisel,* 853 F.Supp. 1344, 1356 (D.Kan.1994) (testimony that minority shareholder plaintiffs declined to pursue other opportunities upon understanding they would someday have the opportunity to control the bank in which they owned shares, does not demonstrate substantial reliance or detriment for promissory estoppel under Kansas law).

Finally, for the reasons explained earlier in this order where the court discussed plaintiff's Title VII claims, defendants are entitled to summary judgment upon plaintiff's claims of constructive discharge and retaliation as they relate to the FMLA.

Conclusion

Defendants' motion for summary judgment shall be granted.

**IT IS SO ORDERED.**